**TRAILER TRAIN COMPANY, a corporation and Railbox Company, a corporation, Plaintiffs-Appellees,**

v.

**STATE BOARD OF EQUALIZATION, Defendant-Appellant.**

No. 81–4188.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 10, 1982.

Decided Jan. 25, 1983.

Calvin J. Abe, Deputy Atty. Gen., San Francisco, Cal., for defendant-appellant.

Weyman Lundquist, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for plaintiffs-appellees.

Before HAYNSWORTH,\* and CHOY, Circuit Judges, and JAMESON,\*\* District Judge.

CHOY, Circuit Judge:

The issue in this case is whether the district court erred in granting a preliminary injunction preventing the California State Board of Equalization (Board) from collecting an amended property-tax bill levied on appellees' railroad cars. The district court found that the imposition of the additional tax impermissibly conflicted with § 306 of the Railroad Revitalization and Regulatory Reform Act of 1976 (the 4–R Act), current version at 49 U.S.C. § 11503 [1], which prohibits the taxation of rail-transportation property at a rate higher than the rate generally applicable to commercial and

---

\* The Honorable Clement Haynsworth, Senior United States Circuit Judge for the Fourth Circuit, sitting by designation.

\*\* The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

1. Section 306 of the 4–R Act was originally codified at 49 U.S.C. § 26c. The statute was recodified by the Revised Interstate Commerce Act of 1978, Pub.L. 95–473, § 11503, 92 Stat. 1337, 1445, and is currently found at 49 U.S.C. § 11503. The intent of the Revised Act was to restate without substantive change the laws that were replaced. Pub.L. 95–473, § 3(a), 92 Stat. 1337, 1466. Though there are some differences between the original § 306 and its recodification in 49 U.S.C. § 11503, we will use "section 11503" to mean both versions and cite to the current codification. We will refer to the original language of § 306 only when necessary to assist in the interpretation of the statute.

The recodified version, 49 U.S.C. § 11503, states:

(a) In this section—

(1) "assessment" means valuation for a property tax levied by a taxing district.

(2) "assessment jurisdiction" means a geographical area in a State used in determining the assessed value of property for ad valorem taxation.

(3) "rail transportation property" means property, as defined by the Interstate Commerce Commission, owned or used by a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title.

(4) "commercial and industrial property" means property, other than transportation property and land used primarily for agricultural purposes or timber growing, devoted to a commercial or industrial use and subject to a property tax levy.

(b) The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a State may not do any of them:

industrial property in the same assessment jurisdiction. We concur in the district court's underlying conclusions that § 11503 applies to the Board's attempt to collect the additional tax, that § 11503 authorizes a district court to enjoin tax-rate discrimination, and that, under the circumstances of this case, the traditional prerequisites for preliminary injunction need not be satisfied. We find, however, that the district court's method of selecting the tax rate generally applicable to commercial and industrial property, which is the necessary first step in determining the existence of tax-rate discrimination, was defective. We therefore affirm in part, and vacate and remand in part.

## I. Facts[2]

California classifies and taxes the bulk of its property as "secured" or "unsecured."[3]

> (1) assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.
> (2) levy or collect a tax on an assessment that may not be made under clause (1) of this subsection.
> (3) levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.
> (4) impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title.
> (c) Notwithstanding section 1341 of title 28 and without regard to the amount in controversy or citizenship of the parties, a district court of the United States has jurisdiction, concurrent with other jurisdiction of courts of the United States and the States, to prevent a violation of subsection (b) of this section. Relief may be granted under this subsection only if the ratio of assessed value to true market value of rail transportation property exceeds by at least 5 percent, the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction. The burden of proof in determining assessed value and true market value is governed by State law. If the ratio of the assessed value of other com-

The secured and unsecured tax rolls each contain both real and personal property. The secured tax rate is calculated anew each fiscal year, while the unsecured tax rate is equal to the tax rate applied to secured property in the preceding fiscal year. Cal. Const. art. XIII, § 12; Cal.Rev. & Tax Code § 2905 (West 1970 & Supp. 1982).

Private railroad cars are considered personal property and are subject to a separate tax under California's Private Railroad Car Tax Law, Cal.Rev. & Tax Code § 11401 (West 1970 & Supp.1982). The tax rate for private railroad cars is the average rate of general property taxation for the preceding year, *id.*, which is basically the weighted average of the prior year's secured and unsecured tax rates.

In June 1978, California voters approved Proposition 13, Cal. Const. art. XIIIA,

mercial and industrial property in the assessment jurisdiction to the true market value of all other commercial and industrial property cannot be determined to the satisfaction of the district court through the random-sampling method known as a sales assessment ratio study (to be carried out under statistical principles applicable to such a study), the court shall find, as a violation of this section—

> (1) an assessment of the rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the assessed value of all other property subject to a property tax levy in the assessment jurisdiction has to the true market value of all other commercial and industrial property; and
> (2) the collection of an ad valorem property tax on the rail transportation property at a tax rate that exceeds the tax ratio rate applicable to taxable property in the taxing district.

**2.** A more detailed statement of the facts can be found in the district court opinion reported at 511 F.Supp. 553, 555 (N.D.Cal.1981).

**3.** The secured roll consists of "State assessed property and other property, the taxes on which are a lien on real property sufficient ... to secure payment of the taxes." The unsecured roll consists of real property, such as possessory interests in tax-exempt land, and personal property, such as business inventories, which do not appear on the secured roll. Cal.Rev. & Tax Code § 109 (West 1970).

which limits the tax rate applicable to real property. Relying on Article XIII, section 2, of the California Constitution, which requires that personal property not be taxed at a rate higher than that applied to real property in the same jurisdiction, the Board at that time determined that the Proposition 13 tax-rate limitation must also be applied to limit the tax on private railroad cars. Accordingly, it levied a tax on railroad cars owned by the Trailer Train Company and the Railbox Company (the Companies) for fiscal year 1978–79 at the lower Proposition 13 rate, estimated at $4.85 per hundred dollars of assessed value, instead of the usual rate prescribed by the Private Railroad Car Tax Law. This latter tax rate, calculated by taking the weighted average of the secured and unsecured rates for fiscal year 1977–78, would have amounted to $10.68 per hundred dollars of assessed value.

The situation remained unchanged until August 1980, when the California Supreme Court ruled that the Proposition 13 tax-rate limitation did not apply to real or personal property on the 1978–79 unsecured roll. *Board of Supervisors v. Lonergan*, 27 Cal.3d 855, 616 P.2d 802, 167 Cal.Rptr. 820 (1980), *cert. denied*, 450 U.S. 918, 101 S.Ct. 1362, 67 L.Ed.2d 344 (1981). The Board interpreted *Lonergan* as rendering improper its application of the Proposition 13 tax-rate limitation to private railroad cars for fiscal year 1978–79.[4] Therefore, in October 1980, the Board recalculated the tax on private railroad cars for 1978–79, this time using the rate of $10.68 per hundred dollars of assessed value—the rate the Board would have initially applied had it not believed Proposition 13 to be controlling. The Board levied and attempted to collect from the Companies an additional tax equal to the difference between the tax computed at the $10.68 rate and the tax previously paid at the $4.85 rate.

The Companies sued to enjoin the Board from collecting this additional tax on the ground that the additional tax discriminated against owners of rail-transportation property in violation of 49 U.S.C. § 11503. The district court granted the Companies' motion for preliminary injunction, and the Board filed this appeal.

On appeal, the Board argues that the district court erred in granting the preliminary injunction because (1) the alleged discriminatory tax was imposed before the effective date of § 11503; (2) § 11503 does not authorize a district court to enjoin tax-rate discrimination; (3) there was no tax-rate discrimination; and (4) the necessary preconditions for the grant of a preliminary injunction have not been met.

II. *Discussion*

A. *Application of § 11503*

■ The 4–R Act was passed in 1976, but the effective date of § 11503 was postponed for three years to February 1979. Pub.L. No. 94–210, § 306, 90 Stat. 31, 54 (1976). The assessment of the Companies' property on which the additional tax is based was made in 1978, several months before the effective date of § 11503. The Board, however, tried to collect this additional tax in 1980, after the effective date of § 11503. Since § 11503(b) prohibits not only assessments which discriminate against rail-transportation property, but also the collection of taxes based on discriminatory tax rates, § 11503 appears clearly to apply to the Board's collection of the additional tax.

■ The Board puts forth a creative argument in an attempt to avoid the application of § 11503. It argues that since the additional tax is based on assessments made in 1978 and is intended merely to correct its mistaken calculation of taxes owed for that year, the additional tax should relate back to 1978 and thus be deemed to have been

4. The Board apparently reasoned that since the California Supreme Court had held in *Lonergan* that Article XIII, section 12, which requires that unsecured property be taxed at the rate applied to secured property in the preceding year, was not impliedly repealed, then the California Private Railroad Car Tax Law, which also uses a formula based on the rates from the previous year, should likewise remain in effect. We express no opinion on the validity of the Board's interpretation of the *Lonergan* decision.

imposed before the effective date of § 11503.

The Board's relation-back argument is not persuasive. Congress' purpose in postponing the effective date of § 11503 was to afford the states sufficient time to comply with the statute's prohibition against discriminatory tax treatment of railroad property. H.R.Rep. No. 725, 94th Cong., 1st Sess. 76 (1975). It was not to provide states with an additional opportunity to impose and collect discriminatory taxes. Allowing the additional tax to relate back to 1978 and thus escape the application of § 11503 not only would subvert Congress' purpose in postponing the statute's effective date, but also would run counter to the basic policy of § 11503 to prohibit discriminatory taxation of railroad property.[5]

### B. *Power to Enjoin Tax-Rate Discrimination*

Whether a district court has jurisdiction under § 11503 to enjoin the use of a discriminatory tax-rate presents a sticky exercise in statutory interpretation. Subsection (b) of § 11503 prohibits, among other things, the discriminatory assessment of rail-transportation property and the levy or collection of a tax based on discriminatory tax rates. The first sentence of subsection (c) then grants the district court jurisdiction to prevent a violation of subsection (b).

But the second sentence of subsection (c) provides that "[r]elief may be granted under this subsection *only if* the ratio of assessed value to true market value of rail transportation property exceeds by at least 5 percent, the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction." (Emphasis added.) Under a narrow, literal reading of § 11503, it would appear that, while tax-rate discrimination constitutes a violation of the statute, injunctive relief can only be granted if the tax-rate discrimination is accompanied by an assessment-ratio discrimination of at least 5 percent.

A statute, however, should not be interpreted so narrowly as to defeat its obvious intent. In interpreting a statute, the court's objective should be to ascertain congressional intent and give effect to legislative will. *Philbrook v. Glodgett,* 421 U.S. 707, 713–14, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1974); *United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940).

The purpose of § 11503 is "to eliminate the long-standing burden on interstate commerce resulting from discriminatory State and local taxation of common and contract carrier transportation property."[6] Congress recognized that discrimination

---

5. The district court found that even if the Board's relation-back argument were accepted, § 11503 would still apply. 511 F.Supp. at 557–58. The court stated that when Congress acts in such a way as to manifest its purpose to exercise its constitutional authority, the regulatory power of the state ceases to exist. Citing *Erie Railroad v. New York,* 233 U.S. 671, 681, 34 S.Ct. 756, 759, 58 L.Ed. 1149 (1913), the court concluded that California's power to enact a discriminatory tax law ended with the passage of § 11503 in 1976 even though the statute's effective date was postponed to February 1979. The court thus found that the relation-back of the additional tax to 1978 would not prevent the application of § 11503.

We express no opinion on the validity of the district court's disposition of this question. Because we conclude that the additional tax did not relate back to 1978, we need not reach the question of whether § 11503 would still apply if such relation-back were allowed.

6. The quoted language comes from the statement of purpose found in S.Rep. No. 630, 91st Cong., 1st Sess. 1 (1969), which accompanied an earlier version of § 11503 that failed to pass. Section 11503, when finally passed, was included as a small part of a comprehensive bill aimed at revitalization of the railroad industry and was consequently given scant attention in the committee reports to the bill. Before passing § 11503, however, Congress had given quite extensive consideration to numerous bills containing language virtually identical to that found in § 11503. The legislative histories of these prior bills provide greater insight into Congress' intent in passing § 11503. We believe it proper to rely on the legislative histories of these prior bills to assist us in interpreting § 11503. Such an approach to interpreting § 11503 was specifically approved by this court in *Arizona v. Atchison, T. & S.F. R.R.,* 656 F.2d 398, 404 n. 6 (9th Cir.1981).

against rail-transportation property can result from either assessment variation or tax-rate variation. S.Rep. No. 1085, 92d Cong., 2d Sess. 5 (1972); S.Rep. No. 630, 91st Cong., 1st Sess. 3 (1969). It thus drafted § 11503 to prohibit the discriminatory use of either of these methods. Congress also believed that a federal court remedy for carriers subject to discriminatory taxation was necessary because state courts were not providing them with a plain, speedy, and efficient remedy. S.Rep. No. 1085, 92d Cong., 2d Sess. 4–5 (1972); S.Rep. No. 630, 91st Cong., 1st Sess. 6–7 (1969). It thus included in § 11503 a procedural component which authorizes victims of discrimination to seek injunctive relief in federal court.

■ Given the basic concerns motivating Congress' enactment of § 11503, Congress could not have intended that the statute be construed as authorizing the district court to enjoin a tax-rate discrimination only when it is accompanied by an assessment-ratio discrimination. Such a literal reading of § 11503 ignores Congress' recognition that discriminatory taxation of carriers can result from *either* assessment-ratio or tax-rate discrimination. It also undermines Congress' intent to provide discrimination victims with an injunctive federal-court remedy by placing arbitrary limits on those who could apply for such relief.

■ The literal reading of § 11503 leads to the absurd result that a district court could enjoin the use of an assessment-ratio excessive by 6 percent, but would be powerless to enjoin the use of a tax-rate excessive by 80 percent unless it were also accompanied by the use of an excessive assessment ratio. A court may look beyond the express language of a statute where a literal interpretation thwarts the purpose of the overall statutory scheme or leads to an absurd result. *Cantwell v. County of San Mateo,* 631 F.2d 631, 634 (9th Cir.1980), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981); *International Telephone and Telegraph Corp. v. General Telephone and Electronics Corp.,* 518 F.2d 913, 917–18 (9th Cir.1975); *see United States v. American Trucking Associations, Inc.,* 310 U.S. at 543–44, 60 S.Ct. at 1064. In view of Congress' clear purpose in enacting § 11503, we hold that the statute is properly construed as granting the district court jurisdiction to enjoin a tax-rate discrimination independent of any assessment-ratio discrimination.[7]

C. *Existence of Tax-Rate Discrimination*

Section 11503(b)(3) prohibits the taxation of rail-transportation property at a tax rate higher than the tax rate generally applicable to commercial and industrial property in the same assessment jurisdiction.[8] To dis-

7. The Board argues for a construction of § 11503 that is even more extreme than the literal reading of the statute. The Board contends that § 11503 authorizes a district court to enjoin only an assessment-ratio discrimination resulting from the use of inaccurate valuation procedures. Under this approach, neither a tax-rate discrimination nor an assessment-ratio discrimination that was not caused by an inaccurate valuation could be enjoined. To understand the Board's argument it should be noted that an assessment-ratio discrimination can occur in two ways. First, state law could simply provide that rail-transportation property be assessed at a higher ratio to true market value than other commercial and industrial property. *Second,* even though state law requires equal assessment ratios, state and local assessors could by administrative practice inflate the true market value of rail-transportation property relative to other commercial and industrial property, thereby resulting in a high-

er assessment ratio for rail-transportation property. *See Clinchfield R.R. v. Lynch,* 527 F.Supp. 784, 785 n. 5 (E.D.N.C.1981).

The Board's interpretation of § 11503 authorizes the district court to enjoin only an assessment-ratio discrimination resulting from the second method. This interpretation of § 11503 is even more subversive of Congress' purpose to prohibit the use of either an assessment-ratio or a tax-rate discrimination and to provide discrimination victims with an injunctive federal court remedy than the literal reading of the statute. Since we have already rejected the literal reading of § 11503 as being inconsistent with congressional intent, the Board's interpretation must also fail.

8. This language is taken from the original version of the statute, § 306 of the 4–R Act. The recodified version of the statute, § 11503(b)(3), deletes without any explanation the word "gen-

cern whether California has imposed a discriminatory tax rate in violation of § 11503(b)(3), it is necessary to compare the tax rate applied to the Companies' railroad cars with that generally applicable to commercial and industrial property. Our task is complicated by the fact that, while the rate applied to the Companies' railroad cars is readily available ($10.68 per $100.00 of assessed value), California has no specific tax rate for commercial and industrial property. Instead, California classifies and taxes its property as "secured" or "unsecured," with commercial and industrial property appearing on both the secured and unsecured rolls.[9] The secured rate for the year in issue, the 1978–79 fiscal year, was $4.70 per hundred dollars of assessed value. The unsecured rate for that year, under the *Lonergan* decision, should have been set at $10.63 per hundred dollars of assessed value.[10]

■ Neither § 11503 nor its legislative history provides much guidance as to what should be done when a specific rate generally applicable to commercial and industrial property is not readily apparent. We find, however, that for this case the following

approach best conforms to the statute's language and fulfills its intent: The 1978–79 secured and unsecured rolls must be examined to determine which roll contained the majority of California's commercial and industrial property. The tax rate applicable to the roll that contained the majority of the commercial and industrial property shall be deemed the rate generally applicable to commercial and industrial property and shall serve as the base rate for comparison against the Companies' $10.68 rate.[11] If the determination of which roll contained the majority of the state's commercial and industrial property in the 1978–79 fiscal year is not possible, the average tax rate for all property shall be used as the basis for comparison.

■ In selecting the base rate for comparison against the Companies' rate, the district court failed to focus on the crucial issue of which tax roll contained the majority of the state's commercial and industrial property. Instead, the court apparently assumed that since California has no specific rate for commercial and industrial property, the rate generally applicable to commercial and industrial property could not be deter-

erally." *See* H.R.Rep. No. 1395, 95th Cong., 2d Sess. 178–79, *reprinted in* 1978 U.S.Code. Cong. & Ad.News 3009, 3187–88. Since the recodified version was intended to restate without substantive change the original version, Pub.L. 95–473, § 3(a), 92 Stat. 1337, 1466, we read § 11503(b)(3) as prohibiting the taxation of rail-transportation property at a rate higher than the rate *generally* applicable to commercial and industrial property.

9. The fact that property is of a commercial or industrial type has no bearing on whether it is placed on the secured or the unsecured roll.

10. Twenty-two counties levied taxes on the 1978–79 unsecured roll at the proper rate of $10.63 per hundred dollars of assessed value. Thirty-six counties, however, under the mistaken belief that the Proposition 13 tax limitation applied to the 1978–79 unsecured roll, levied at the rate of $4.70 per hundred dollars of assessed value. The California legislature has assumed responsibility for deciding what action to take with respect to the collection of additional unsecured roll property taxes in these thirty-six counties. There is nothing in the record to indicate how or whether this question has been resolved.

11. We believe that selection of the rate imposed on the majority of the commercial and industrial property as the base rate is preferable to the selection of the potential alternatives of the weighted average of the rates imposed on all commercial and industrial property or the weighted average of the rates imposed on all property. First, the rate applicable to the majority of commercial and industrial property has the advantage of being an actual rate in existence as opposed to a manufactured rate not specifically applicable to any property in the state. The use of an actual rate allows for easier calculation and minimizes the degree of disruption to the state's tax structure that would result if adjustments were necessary to avoid discriminatory taxation. Second, the use of the rate applicable to the majority of the commercial and industrial property adequately satisfies the basic purpose of § 11503, which is to prevent states from discriminatory taxation of rail-transportation property. As long as the majority of commercial and industrial property is taxed at the same rate as rail-transportation property, the owners of such commercial and industrial property can be expected to provide a strong check against any state discrimination.

mined.[12] It then interpreted the latter portion of § 11503(c) as requiring the use of the average tax rate for all property as the basis for comparison in this assumed situation.[13]

Under our reading of § 11503, the fact that California has no specific rate for commercial and industrial property does not mean that a rate generally applicable to such property cannot be determined. The absence of a specific rate merely requires that the inquiry be shifted to which roll, the secured or unsecured, contained the majority of the state's commercial and industrial property in the 1978–79 fiscal year.

Because the district court misinterpreted § 11503, it failed to make this crucial inquiry. Its method of selecting the base rate for comparison against the Companies' rate

was thus materially flawed and its consequent finding of discrimination cannot be accepted. Unfortunately, the record does not contain sufficient evidence for us independently to determine which roll contained the majority of the state's commercial and industrial property. The case must therefore be remanded for that determination. On remand, we instruct the district court to adopt the approach we have set forth in this opinion in selecting the proper base rate for comparison.[14] Such a selection is, of course, a necessary step in determining whether California has imposed a discriminatory tax rate on the Companies' railroad cars.

### D. Preconditions for Preliminary Injunction

Finally, the Board argues that the district court erred in granting the preliminary in-

---

**12.** The district court's assumption that the rate generally applicable to commercial and industrial property could not be determined may also have been based in part on its acceptance of the Companies' assertion that reliable and current data concerning the relative amounts of commercial and industrial property on the 1978–79 secured and unsecured rolls are not available. As support for this assertion the Companies cited the deposition testimony of Jeffery L. Reynolds, Chief of the Statistical Research and Consulting Division of the California State Board of Equalization. A review of Reynolds' testimony, however, reveals that it does not support the Companies' assertion. Thus, if the district court relied upon the Companies' assertion, it was in error.

Reynolds testified that since the counties do not break their assessments down into categories that approximate residential, commercial, or industrial property, he could not give exact figures on how much commercial and industrial property was on the 1978–79 secured or unsecured roll. He did state, however, that he could provide a pretty good estimate of such figures on the basis of triennial surveys conducted by the Board. These surveys enable the Board to estimate distributions of assessed value by broad property types, including commercial and industrial property. Thus contrary to the Companies' assertion, Reynolds' testimony strongly suggests that sufficient data are available to determine the relative amounts of commercial and industrial property on the 1978–79 secured and unsecured rolls.

Significantly, neither party asked Reynolds whether, on the basis of the triennial surveys, he could determine which roll in 1978–79 contained the majority of the state's commercial and industrial property. The parties' failure to pursue this inquiry, and the district court's fail-

ure to demand it, reinforces our belief that district court's approach to selecting the base rate for comparison was misguided.

**13.** We disagree with the district court that the latter portion of § 11503(c) *requires* the use of the average tax rate for all property as a basis for comparison when the rate generally applicable to commercial and industrial property cannot be determined. We read the latter portion of § 11503 as applying exclusively to assessment-ratio cases and thus prescribing an alternative formula to be used only for assessment-ratio, and not for tax-rate, cases. Our reading of § 11503(c) is strongly supported by the fact that the subsection, by its terms, provides that resort to the average tax rate for all property be made *only if* the relevant assessment ratios cannot be determined to the satisfaction of the district court. Although we find that the latter portion of § 11503(c) does not specifically apply to tax-rate cases, we believe that it provides a useful analogy to follow. We thus, for reasons different from those articulated by the district court, conclude that the average rate for all property should be used when the rate generally applicable to commercial and industrial property cannot be determined.

**14.** Because of our decision to remand, we decline to decide the issue of whether the five percent limitation in § 11503(c) applies to a tax-rate case. This issue would be relevant only in the event that the district court, following our approach, selected the unsecured rate as the rate generally applicable to commercial and industrial property. We thus believe that it would be premature to decide the issue at this time.

junction without first requiring the establishment of the standard equitable prerequisites for such relief.[15] We disagree.

 The standard requirements for equitable relief need not be satisfied when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief. *Atchison, Topeka and Santa Fe Railway v. Lennen,* 640 F.2d 255, 259–61 (10th Cir.1981); *see United States v. City and County of San Francisco,* 310 U.S. 16, 30–31, 60 S.Ct. 749, 756–57, 84 L.Ed. 1050 (1940). Section 11503 clearly falls within this exception because its subsection (c) specifically authorizes a district court to grant injunctive relief to prevent a violation of the statute.[16] *See Atchison, Topeka and Santa Fe Railway v. Lennen,* 640 F.2d 255 (expressly applying exception to § 11503). The Board provides no convincing reason why this exception should not apply in the present case.

III. *Conclusion*

We are in basic agreement with the district court with respect to the following findings: (1) Section 11503 is fully applicable to the Board's attempt to collect the additional tax levied against the Companies' railroad cars; (2) the statute authorizes the district court to enjoin a tax-rate discrimination independent of any assessment-ratio discrimination; and (3) traditional prerequisites for equitable relief need not be satisfied before a preliminary injunction may be issued under § 11503.

However, because we also find that the district court erred in selecting the tax rate generally applicable to commercial and industrial property, we cannot affirm its determination that the Board imposed a discriminatory tax rate on the Companies' railroad cars. Section 11503 requires that the rate generally applicable to commercial and industrial property be used as the base tax rate for comparison against the Companies' rate for purposes of determining discrimination. On remand we instruct the district court to ascertain which tax roll, the secured or unsecured, contained the majority of California's commercial and industrial property in fiscal year 1978–79. The tax rate applicable to the selected roll shall be the rate generally applicable to commercial and industrial property and shall be used as the base rate for comparison against the Companies' rate. If it is impossible to determine which roll contained the majority of the state's commercial and industrial property, the average tax rate for all property shall be used as the basis for comparison.

AFFIRMED in part; VACATED and REMANDED in part.

---

**15.** The Board also argues that the district court erred in failing to require the giving of security under Fed.R.Civ.P. 65(c). Because of our decision to remand, it is not necessary for us to address this argument. We only note that, in view of Rule 65(c), the propriety of the district court's failure to require security appears doubtful. We thus suggest that should the district court, on remand, again decide to grant a preliminary injunction without requiring the giving of security, it provide specific reasons for such action.

**16.** Section 11503(c) states that "a district court of the United States has jurisdiction ... to prevent a violation" of the substantive provisions of the statute. The original version of the statute, § 306 of the 4–R Act, states that "the district courts of the United States shall have jurisdiction ... to grant such mandatory or prohibitive injunctive relief, interim equitable relief, and declaratory judgments as may be necessary to prevent ... any acts in violation of this section." Since § 11503(c), the recodified version, restates without substantive change the original version, Pub.L. 95–473, § 3(a), 92 Stat. 1337, 1466, we refer to the original version to aid our interpretation of the statute. The original version confirms our view that § 11503(c) specifically authorizes a district court to grant injunctive relief to prevent a violation of § 11503.