**RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC. and Alliance of Artists and Recording Companies, Plaintiffs,**

v.

**DIAMOND MULTIMEDIA SYSTEMS, INC., Defendant.**

**No. CV 98–8247 ABC (RZx).**

United States District Court, C.D. California.

Oct. 26, 1998.

Laurence J. Hutt, Brian K. Condon, Arnold & Porter, Los Angeles, CA, Hadrian R. Katz, Helene T. Krasnoff, Arnold & Porter, Steven B. Fabrizio, Washington, DC, for Plaintiffs.

Andrew P. Bridges, Diane E. Turrif, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, for Defendant.

ORDER RE: Plaintiff's Motion
for Preliminary Injunction

COLLINS, District Judge.

Plaintiffs Motion for a Preliminary Injunction came on for hearing on October 26, 1998. After reviewing the materials submitted by the parties, the arguments of counsel, and the case file, the Court hereby DENIES Plaintiffs' Motion for Preliminary Injunction.

## I. Factual Background

This action arises from the efforts of Plaintiffs RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC. and ALLIANCE OF ARTISTS AND RECORDING COMPANIES ("Plaintiffs") to preliminarily enjoin alleged violations of the Audio Home Recording Act of 1992, 17 U.S.C. §§ 1001 et seq. ("AHRA") by Defendant DIAMOND MULTIMEDIA SYSTEMS, INC. ("Defendant").

The material facts of this case are undisputed. Plaintiffs are trade organizations representing the creators, manufacturers, and distributers of over ninety percent of all legitimate sound recordings. Defendant is a leading manufacturer of computer products, specializing in products to improve multimedia, audio, graphics, video, and communications uses of personal computers. Defendant is currently manufacturing—and intends to distribute—a device it calls the Rio PMP 300 (the "Rio"). The Rio is a lightweight, handheld device, capable of receiving, storing, and re-playing digital audio file stored on the hard drive of a personal computer. After the Rio receives a digital audio file, the Rio user can detach the Rio from the computer and play back the audio file separately through headphones while away from the computer. Notably, the Rio has no digital audio *output* capability, and therefore is incapable of passing on digital musical files to other Rio devices, or to other manufacturers' devices.

The Rio relies upon a relatively new technology for compressing sound files: MPEG 1 Layer 3 ("MP3"). MP3 compresses by a 10:1 ratio, allowing approximately 60 minutes of music to be compressed to 32 megabytes of memory. The Rio itself contains 32 megabytes of memory, but this can be doubled by the purchase of a removable memory "card." Because the card is removable, a Rio user could record music on the memory card, and then give that card to any other Rio user.

## II. Procedural Background

On October 9, 1998, Plaintiffs filed a Complaint and Ex Parte Application for Tempo-

rary Restraining Order and Order to Show Cause Re Preliminary Injunction. The Complaint alleged a single cause of action for violation of the AHRA. On October 13, 1998, Defendant filed an Opposition to the Ex Parte Application for TRO. On October 14, 1998, Plaintiffs filed their Reply.

On October 16, 1998, this Court heard oral argument on the merits, and issued a TRO enjoining Defendant from manufacturing or distributing the Rio. The TRO was contingent on Plaintiffs posting a bond in the amount of $500,000.

On October 20, 1998, Defendant filed its Opposition to the application for a preliminary injunction. On October 22, 1998, Plaintiffs filed their Reply.

### III. Discussion

#### A. Preliminary Injunction Standard

■ Traditionally, a court may issue a preliminary injunction if it determines: (1) the moving party will suffer irreparable injury if the relief is denied; (2) the moving party will probably prevail on the merits; (3) the balance of potential harm favors the moving party; and, depending on the nature of the case, (4) the public interest favors granting relief. *International Jensen v. Metrosound U.S.A.*, 4 F.3d 819, 822 (9th Cir.1993).

Under the "alternative standard," a party may obtain a preliminary injunction, by demonstrating *either:* (1) a combination of probable success on the merits and the possibility of irreparable injury if relief is not granted; or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor. *Id.* "The alternative standards are not separate tests but the outer reaches of a single continuum." *Id.* (quotation omitted). Essentially, the trial court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. Schwarzer & Tashima, *Federal Civil Procedure Before Trial,* at 13:39.

#### 1. Injunctive Relief Authorized By Federal Statute

■ Plaintiffs advance two arguments in support of a departure from the traditional

equitable considerations governing injunctive relief. First, Plaintiffs cite *Trailer Train Co. v. State Board of Equalization,* 697 F.2d 860, 869 (9th Cir.1983) for the proposition that "traditional proof of irreparable harm is not required ... [w]here a federal statute grants authority to enjoin violations." Pf.'s Reply at 19:24–26. Although Plaintiffs are correct that irreparable harm is not mandatory when a federal statute authorizes injunctive relief, the existence of an authorizing statute does not *per se* preclude consideration of traditional equitable factors, including irreparable harm. *Miller v. California Pacific Medical Center,* 19 F.3d 449, 457–58 (9th Cir.1994)(provision of National Labor Relations Act authorizing injunctive relief "as deemed just and proper" requires consideration of traditional equitable factors). As noted in *Miller,*

> [the] commonplace considerations applicable to cases in which injunctions are sought in the federal courts reflect a "practice with background of several hundred years of history," a practice of which Congress is assuredly well aware. Of course, Congress may intervene and guide or control the exercise of the courts' discretion, but we do not lightly assume that Congress has intended to depart from established principles.... Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized.

*Id.* at 458 (quoting *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); *see Flynn v. United States,* 786 F.2d 586, 591 (3d. Cir.1986)(unless federal statute requires mandatory injunction, traditional equitable considerations apply).

In the instant action, the AHRA states that "the court—*may* grant temporary and permanent injunctions *on such terms as it deems reasonable* to prevent or restrain such violation[s]." AHRA § 1009(c)(1). In light of this discretion, the Court declines to depart from traditional equitable considerations in assessing the propriety of injunctive relief.

## 2. Presumption of Irreparable Harm

■ Second, Plaintiffs argue that "[t]he AHRA is inextricably related to the rights provided under the Copyright Act," and that therefore Plaintiffs are "entitled to [the] presumption of irreparable harm that arises" in copyright actions. Plfs.' Reply at 18:10–24.[1]

The Court disagrees. It is undisputed that "[a] copyright plaintiff who makes out a prima facie case of *infringement* is entitled to a preliminary injunction without a *detailed* showing of irreparable harm." *Triad Systems Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1335 n. 9 (9th Cir.1995)(emphasis added)(quoting *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1254 (3d Cir.1983)). In the instant action, however, Plaintiffs are not asserting a copyright claim. If, as Plaintiffs contend, the Rio is subject to the AHRA, then copyright infringement is impossible as a matter of law. *See* AHRA § 1008 (prohibiting copyright infringement actions). Even if the Rio is not subject to the AHRA—and therefore governed by the Copyright Act—Defendant has a potential "fair use" defense that might defeat any prima facie showing of infringement. *See Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 439–40, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984).

Moreover, the relatively few copyright cases that actually explain the rationale for the presumption confirm its inapplicability to the instant action. For example, Plaintiffs quote from *Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp.*, 25 F.3d 119, 124 (2d Cir. 1994) for the proposition that copyright infringement "will damage the copyright holder in incalculable and incurable ways." Plfs.' Reply at 18:16–18. Adding context to the *Fisher–Price* quotation, the full paragraph reads:

Normally, when a copyright is infringed, irreparable harm is presumed; this is because the confusion created in the marketplace will damage the copyright holder in incalculable and incurable ways. [Citations omitted]. "[C]onfusion may cause

purchasers to refrain from buying either product and to turn to those of other competitors.... Furthermore, if an infringer's product is of poor quality, ... a more lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market." [Quotation omitted]. *Id.; see also Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1288–89 (10th Cir.1996)(presumption appropriate "[b]ecause the financial impact of copyright infringement is hard to measure and often involves intangible qualities such as customer goodwill"); *Marcy Playground, Inc. v. Capitol Records, Inc.*, 6 F.Supp.2d 277, 281 (S.D.N.Y. 1998)("the theory underlying the presumption rests on the difficulty of remedying confusion in the market place by an award of damages").

The instant action, however, does not raise issues of "reputation," "quality of goods," or consumer "confusion." Moreover, although a copyright action might "normally" entail "incalculable and incurable" injuries, the instant action does not. The only potentially "incalculable" injury asserted by Plaintiffs is the Rio's contribution to the traffic in illegal MP3 files. As explained in greater detail below, however, even if the Rio were to incorporate SCMS technology, and thus comply with the AHRA, the Rio would *still* contribute to the traffic in illegal MP3 files. This type of injury is precisely why the AHRA provides for royalties. Accordingly, although this type of injury is undeniably "incalculable," it is not a *compensable* injury under the Act, and fails to justify an extension of the irreparable harm presumption applicable in Copyright actions.

## B. Plaintiffs' Probability of Success on the Merits

■ Because the Court has no precedent to guide its interpretation of the AHRA, the Court begins its analysis with the "familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a

---

1. Curiously, Defendant asserts that "[t]his Court has already set forth the standard on preliminary injunction in *Chase–Riboud v. Dreamworks, Inc.*, 987 F.Supp. 1222, 1224 (C.D.Cal.1997)." Df.'s Opp. at 8:3–7. *Chase–Riboud* was a true Copyright action in which this Court held that "a presumption of irreparable injury arises." *Chase–Riboud*, 987 F.Supp. at 1232(J. Collins).

clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Continental Cablevision, Inc. v. Poll,* 124 F.3d 1044, 1048 (9th Cir.1997) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766, (1980)).

### 1. Is the "Rio" a "Digital Audio Recording Device"?

The AHRA defines a "digital audio recording device" as:

> "any machine or device of a type commonly distributed to individuals for use by individuals, whether or not included with or as part of some other machine or device, the digital recording function of which is designed or marketed for the primary purpose of, and that is capable of, making a digital audio copied recording for private use ..." *Id.* § 1001(3).

Defendant proffers two theories why the Rio is not a digital audio recording ("DAR") device. First, Defendant argues that the Rio is not a DAR device because the source of the copy—the computer's hard drive—is not a "digital musical recording." Therefore, the Rio is not capable of making a "digital audio copied recording," which, as defined by Section 1001(1), is "a reproduction in a digital recording format of a digital musical recording." Second, Defendant argues that the Rio is not a DAR device because it does not have a digital "recording function."

### 2. Does the 5(B)(ii) exclusion include a computer's hard drive, thus exempting the Rio from inclusion as a DAR device?

The AHRA governs "digital audio recording devices," defined as

> "any machine or device of a type commonly distributed to individuals for use by individuals, whether or not included with or as part of some other machine or device, the digital recording function of which is designed or marketed for the primary purpose of, and that is capable of, making a digital audio copied recording for private use ..." *Id.* § 1001(3).

A "digital audio copied recording," in turn, is defined as

> "a reproduction in a digital recording format of a digital musical recording, whether that reproduction is made directly from another digital musical recording or indirectly from a transmission." *Id.* § 1001(1).

Finally, a "digital musical recording" is defined as

> "a material object—(i) in which are fixed, in a digital recording format, only sounds, and material, statement, or instructions incidental to those fixed sounds, if any, and (ii) from which the sounds and material can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." *Id.* § 1001(5)(A).

A "digital musical recording" does *not* include

> *a material object—*
>
> (i) in which the fixed sounds consist entirely of spoken word recordings, or
>
> (ii) *in which one or more computer programs are fixed,* except that a digital recording may contain statements of instructions constituting the fixed sounds and incidental material, and statements or instructions to be used directly or indirectly in order to bring about the *perception, reproduction, or communication of the fixed sounds and incidental material.* *Id.* § 1001(5)(B)(emphasis added).

To qualify as a DAR device, therefore, the Rio must be "capable of making" a reproduction of a "digital musical recording".

Plaintiffs argue that the exception in Section (5)(B)(ii) for "material objects ... in which one or more computer programs are fixed" is "not a 'hard drive' exception," but rather "an exception for computer programs, originally designed to clarify that copying of . CD–ROMs containing incidental audio tracks is not intended to be addressed by the AHRA." Plfs.' Reply at 12:5–7. Plaintiffs do not dispute that hard drives are not subject to the AHRA, but argue that this exemption results not from Section (5)(B)(ii), but rather from the Section 1001(3) definition of "DAR device," which excludes devices that do not

have as a "primary purpose" the recordation of digital *audio.*

Defendant, in contrast, argues that the Section (5)(B)(ii) is unambiguous on its face and that "material objects ... in which one or more computer programs are fixed" encompasses not only computer programs on CD–ROM, but also hard drives and other "material objects" including "Zip drives, integrated circuits, circuit boards and the like." Df.'s Opp. at 10:13–16. Defendant argues that excluding hard drives from the definition of "digital musical recording" was part of "Congress' intent to exclude the personal computer industry" from regulation under the AHRA. Df.'s Reply at 11–18:19. Although Defendant's interpretation of Section (5)(B)(ii) has superficial appeal, it is ultimately unsupported by the legislative history, and contrary to the spirit and purpose of the AHRA.

### a. Legislative History

Defendant relies heavily on the declaration of James Burger, an attorney and former Chairman of the Intellectual Property Committee of the Information Industry Council ("ITI"), a trade association representing the interests of the computer industry. Burger Decl. ¶ 2. In his capacity as Chairman of ITI, Burger purports to have "engaged in direct discussions with representatives of the [Consumer Electronics Manufacturers Association "CEMA"] and RIAA officials regarding the AHRA, as well as Legislators and their staff." *Id.* ¶ 4. On the issue of whether Section (5)(B)(ii) encompasses hard drives, Burger provided the following narrative:

I was asked if [ITI] would not oppose the bill if computers were specifically excluded from the legislation. My response was that if the bill contained language that made it clear that neither a computer nor any of its peripherals were covered we would not oppose the legislation.

The result of our discussions was the specific language now contained in Section 1001(5)(B)(ii). *Under that subsection once a music file was fixed on a computer's*

*hard drive as semipermanent memory of any kind, it was no longer a digital musical recording covered by the Act.* Accordingly, we advised CEMA members and the RIAA that we would not oppose the AHRA. The legislative history is clear on this point:

"Similarly, neither a personal computer whose recording function is designed and marketed primarily for the recording of data and computer programs, nor a machine whose recording function is designed and marketed for the primary purpose of copying multimedia products, would qualify as a 'digital audio recording device.'" Senate Report 102–294 at 59–60.

Burger Decl. ¶¶ 10–11 (emphasis added). Although Burger unequivocally opines that Section (5)(B)(ii) includes hard drives, his reference to the legislative history is not persuasive.

The sentence Burger quotes from the Senate Report[2] to support Defendant's interpretation of *Section (5)(B)(ii)* actually appears in the context of a discussion of *Section 1001(3),* the definition of "DAR device". The previous paragraph of the Senate Report emphasizes that "[t]he definition [of a DAR device] makes clear that a '[DAR] device' must be a machine or device that has a recording function that is designed or marketed for the *primary purpose* of making a digital audio copied recording." (Emphasis added). Continuing, the Senate Report elaborates on the application of the "primary purpose" standard, illustrating the application of the standard to a videocassette recorder. *See* Senate Report at *52. As a second example of the "primary purpose" test of Section 1001(3), the Senate Report includes that language quoted by Burger:

"Similarly, neither a personal computer whose recording function is designed and marketed primarily for the recording of data and computer programs, nor a machine whose recording function is designed and marketed for the primary purpose of copying multimedia products, would quali-

**2.** Senate Judiciary Committee, 102nd Cong., 2nd Sess., Report No. 102–294, 1992 WL 133198 (June 9, 1992) (hereinafter "the Senate Report").

fy as a 'digital audio recording device.' " Senate Report at *52–*53.

Because this language addresses the Section 1001(3) definition of "primary purpose," rather than the Section (5)(B)(ii) definition of "material object," Burger's reference to the passage appears misplaced.[3]

In contrast, other portions of the legislative history support Plaintiffs' contention that Section (5)(B)(ii) was only intended to avoid immunizing the illegal copying of computer programs. The House Judiciary Committee Report,[4] for example, states that

> A definition of "digital musical recording" has been added, with revisions reflecting *exemptions for talking books and computer programs.*
>
> . . .
>
> As with "talking books," the bill *specifically excludes computer programs* (which generally are classified under the Copyright Act as literary works). In addition to containing an *express exclusion of computer programs in the definition of "digital musical recording,"* the Committee expressly includes the technical embodiment of statements of instructions incidental to the playback or reproduction of music by referencing such statements or instructions in both sections 1001(5)(A)(i) and (B)(ii).

House Report at *21. These passages, albeit far from unequivocal, suggest a legislative intent to avoid immunizing the illegitimate

copying of computer programs from liability for copyright infringement.

### b. Purpose of the AHRA

More importantly, Defendant's construction of Section (5)(B)(ii) would effectively eviscerate the AHRA. Any recording device could evade AHRA regulation simply by passing the music through a computer and ensuring that the MP3 file resided momentarily on the hard drive.

Defendant makes no attempt to rationalize this result, but rather argues that technology has outpaced the AHRA, and that this Court should not re-legislate statutes which failed to anticipate new technology. *See* Transcript of Oral Arg. (TRO Hearing) at 16:2–5 (October 16, 1998). Although the line between "interpretation" and "re-legislation" is not easily defined, the Court is skeptical that Congress intended Defendant's counter-intuitive construction of Section (5)(B)(ii).

### 3. Recording Function

As previously noted, the AHRA only governs DAR devices, defined as

> any machine or device . . . , whether or not included with or as part of some other machine or device, the *digital recording function* of which is designed or marketed for the primary purpose of, and that is capable of, making a digital audio copied recording for private use. AHRA § 1001(3).

Defendant argues—albeit briefly[5]—that the Rio has no "recording function" because "un-

---

**3.** The Burger declaration is controverted by the declaration of Cary Sherman, a former partner in the law firm representing Plaintiffs, and an RIAA representative during the negotiation of the AHRA. Sherman states that

> I met Mr. Burger in connection with industry discussions concerning the AHRA. . . . During the Senate's consideration of [the AHRA], I discussed aspects of the AHRA with representatives of [the Computer and Business Equipment Manufacturers Association], although I do not specifically remember Mr. Burger having a leading role in those discussions.
>
> . . .
>
> [I]t should be clear that at no time in the process that preceded the enactment of the AHRA was there any significant question that the AHRA would not cover general purpose computers and general purpose devices. However, that understanding was always en-

shrined in the "primary purpose" test of the definition of "[DAR] device" now codified at 17 U.S.C. § 1001(3). *Mr. Burger is simply wrong when . . . he suggests that the definition of "digital musical recording" codified at 17 U.S.C. § 1001(5)(B)(ii) was in some way intended to reflect that understanding.* (Emphasis added).

The Court is aware, of course, that as a former attorney for Plaintiffs, Sherman is far from a disinterested witness.

**4.** House Judiciary Committee, 102nd Cong., 2nd Sess., 1992 WL 232935 (September 17, 1992)(hereinafter "the House Report").

**5.** Defendant devotes less than one page of its twenty-five page Opposition to this issue. *See* Df.'s Opp. at 8:14–9:8.

less software on [the] personal computer is used to manage the transfer of files, the Rio will not record anything." Df.'s Opp. at 8:18–20. Although not expressly stated, Defendant's argument suggests that if a peripheral device were reliant on a personal computer for *any* step in the recording process—thereby precluding truly "independent" recording—the peripheral device has no "recording function" for purposes of the AHRA.

Defendant's argument is premised on a single reference in the legislative history:

Although the typical computer would not fall within the definition of "digital audio recording device," a separate peripheral device with an *independent recording function* would be a "digital audio recording device" if the recording function was designed or marketed for the primary purpose of making digital audio copied recordings for private use. Senate Report at *53 (Emphasis added).

Aside from this passage, nothing in the legislative history even remotely suggests that lack of a completely independent recording function removes a device from the purview of the AHRA. To the contrary, the legislative history establishes that the phrase "recording function" was included to ensure that the "primary purpose" test was only applied to the *audio* recording function of a device that could record audio, video, and multimedia. [Cite to Sen Report].

Similarly, nothing in the definition of Section 1001(3) remotely suggests that DAR devices must be able to record independently from the computer. The statute only requires that DAR devices be "capable of making a ... recording." AHRA § 1001(3). It does not say " independently capable of making recordings."

Finally, Defendant's interpretation of the phrase "recording function" is contrary to the purposes of the AHRA. Any device not capable of truly independent recording would evade regulation under the AHRA, even though the device was capable of making digital audio reproductions. The Court is not inclined to undermine the entire statutory scheme based on a single, isolated comment in the legislative history.

### 4. Serial Copying

The AHRA defines "serial copying" as

the duplication in a .digital format of a copyrighted musical work or sound recording from a digital reproduction of a digital musical recording. AHRA § 1001(11).

The Court concurs with Plaintiffs that the two-step process at issue here (audio CD to hard drive; hard drive to Rio) appears to technically satisfy the definition of "serial copying." A conventional audio CD is a "digital musical recording," and the MP3 file "ripped" from an audio CD and stored on the hard drive is a "digital reproduction" of that "digital musical recording." Finally, the version in the Rio is a "duplication" of the "digital reproduction" on the hard drive. Although a personal computer is not a "digital audio recording device," the definition of "serial copying" in Section 1001(11) does not require that the digital reproduction (i.e., the MP3 file on the hard drive) be generated by a "digital audio recording device."

However, although the Rio is bundled with software that facilitates the first step (audio CD to hard drive), that software is independently available today. The innovation the Rio makes possible is the second step (hard drive to Rio).

### 5. Section 1002(a)

Although the two-step process technically satisfies the definition of "serial copying," the AHRA does not *directly* prohibit serial copying. Rather, Section 1002(a) states that

No person shall import, manufacture, or distribute any digital audio recording device ... that does not conform to—

(1) the Serial Copy Management System ["SCMS"];

(2) a system that has the same functional characteristics as the [SCMS] and requires that copyright and generation status information be accurately sent, received, and acted upon between devices using the system's method of serial copying regulation and devices using the [SCMS]; or

(3) any other system certified by the Secretary of Commerce as prohibiting unauthorized serial copying.

Thus, if Defendant incorporated SCMS technology into the Rio, no violation of Section 1002 occurs because the Rio would satisfy subsection (a)(1). This holds true even though the two-step process (CD to hard drive; hard drive to Rio) technically satisfies the Section 1001(11) definition of "serial copying." Incorporating SCMS into the Rio, however, accomplishes nothing. The Rio could not "act[ ] upon ... copyright and generation status information" because the MP3 files on the computer's hard drive do not contain this information.[6] Similarly, it is undisputed that the Rio does not permit downstream copying because the Rio itself has no digital output capability, and the removable flash memory cards cannot be copied by another Rio device. Therefore, it is nonsensical to suggest that the Rio must "sen[d] ... copyright and generation status information."[7] In summary, incorporating SCMS into the Rio appears an exercise in futility. Because a Rio with SCMS would not violate Section 1002, and because a Rio without SCMS is functionally equivalent to a Rio with SCMS, the Court is convinced that the Secretary of Commerce will conclude that the Rio adequately "prohibit[s] unauthorized serial copying" for purposes of subsection (a)(3).[8] Accordingly, Defendant is only violating Section 1002(a) in a most technical sense—by failing to acquire a certificate.[9]

In summary, Plaintiffs' probability of success on the merits is mixed. Although Plaintiffs have established a probability that the Rio is a "digital audio recording device," Plaintiffs have not established a probability of success in establishing that the Rio, if assessed by the Secretary of Commerce, would fail to satisfy Section 1002(a)(3).

## C. Irreparable Injury

■ Plaintiffs acknowledge that, for purposes of preliminary injunction, the irreparable injury "must be *caused* by the alleged wrongful conduct." *Stanley v. University of So. Calif.*, 13 F.3d 1313, 1324–25 (9th Cir.1994)(emphasis added)(cited in Plaintiffs' Reply at 19:26–28).

Assuming that the Rio is subject to the AHRA, and that Defendant ultimately pays any required royalties, the only potential "wrongful conduct" is Defendant's failure to encode SCMS information on recordings stored in the Rio. For the reasons articulated above, the Court is skeptical that the Secretary of Commerce would require Defendant to incorporate SCMS technology. Even if the Secretary did impose that requirement, Plaintiffs have failed to demonstrate a sufficient causal relationship between this "wrongful conduct" and their alleged injuries.

Plaintiffs contend that distribution of the Rio in its current configuration "will harm

---

**6.** Incorporating SCMS into the Rio would not prevent the Rio from downloading an MP3 file from a computer's hard drive. *See* Pohlmann Supp. Dec. ¶ 8 ("SCMS restricts the copying of digital source material *that has been encoded to assert copyright protection*"). Because MP3 files are not "encoded to assert copyright protection," SCMS would not prevent downloading.

**7.** *See* Senate Report at *26 ("Devices that receive digital audio transmissions sent *without copyright and generation status information* shall indicate that copyright is asserted over the transmitted audio material and that the generation status is original.").

**8.** Defendant argues that for over six years the Secretary of Commerce has failed to establish procedures to verify compliance with Section 1002. Section 1002(b), however, only requires the Secretary to "establish a procedure to verify ... that a system meets the standards set forth in *subsection (a)(2).*" (Emphasis added). Subsection (a)(2), however, only applies to a device

that has "a system that has the same functional characteristics as the [SCMS] *and* requires that copyright and generation status information be accurately sent, received, and acted upon...." Section (a)(2), therefore, applies only to devices with digital encoding systems that are similar—but not identical—to SCMS.

Because the Rio does not have a digital encoding system, it does not fall under section (a)(2), and Defendant cannot complain about lack of administrative regulations. Nothing in Section 1002 suggests that elaborate regulations are required for the Secretary to certify a device, pursuant to subsection (a)(3), as a device incorporating a "system ... prohibiting unauthorized serial copying."

**9.** Because Plaintiffs have successfully raised serious questions going to the merits, the Court need not address Plaintiffs' argument that—even if a hard drive falls within Section (5)(B)(ii)—the immediate source of a "digital audio copied recording" (i.e., the hard drive) is irrelevant. *See* Plfs.' Reply at 9:4–11:19.

plaintiffs and the public interest by dramatically stimulating the traffic in illegal MP3 files." Pfs.' Reply at 20:20–22. Although the Rio will inevitably be used to record both legitimate music (e.g., commercially available CDs) and illegitimate music (e.g., copyrighted music illegally posted on the Internet), the absence of the SCMS information does not *cause* the illegitimate uses. Even if the Rio *did* incorporate SCMS, a Rio user could *still* use the device to record unauthorized MP3 files posted to the Internet. Moreover, to the extent Plaintiffs are injured through an illicit use of the Rio, this is precisely the type of injury for which the royalty provisions were adopted. Under these circumstances, the Court concludes that Plaintiffs have failed to establish any irreparable or incalculable injury.[10]

In contrast, Defendant has offered credible evidence that an injunction would substantially impact its projected revenues from the sale of the Rio. *See* Df.'s Opp. at 7:1–27. Regardless of the accuracy of Defendant's estimate ($200 million over the next two years), the Court is convinced that Defendant would at a minimum suffer multi-million dollar losses. Moreover, because the Rio is capable of recording legitimate digital music, an injunction would deprive the public of a device with significant beneficial uses.

## IV. Conclusion

For all these reasons, the Court hereby DENIES Plaintiffs' Motion for a Preliminary Injunction.

**SO ORDERED.**

10. With regard to royalties, it will be relatively simple for Plaintiffs to establish the volumetric distribution and sales of Rio devices to the public.